UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RONALD E. McANINCH,

                        Plaintiff,          **No. 09-CV-0969(MAT)**
         -vs-                               **DECISION AND ORDER**

MICHAEL J. ASTRUE, Commissioner
of Social Security,

                        Defendant.
_____

## I.   Introduction

Plaintiff Ronald E. McAninch ("Plaintiff" or "McAninch"), has
instituted this proceeding pursuant to Title II of the Social
Security Act ("the Act"), seeking review of the final decision of
the Commissioner of Social Security ("the Commissioner") denying
his application for Supplemental Security Income ("SSI").
Plaintiff claims that he has been disabled since June 15, 2000,[1]
due to back pain, depression, anxiety, mental impairments, and
attention deficit-hyperactivity disorder. T.74, 103, 45.[2] However,
the period at issue in this litigation extends only from
September 29, 2003, the date Plaintiff filed for SSI, through
December 18, 2008, the date of the decision by the Administrative

_____

[1]

    Plaintiff previously filed for SSI on September 5, 2000 (Tr. 315-17), but
this application was denied after a hearing on September 9, 2002 (Tr. 29-40,
271-81). Because Plaintiff did not request appellate review of the ALJ's
decision, it became binding. 20 C.F.R. § 416.1455. Plaintiff did not request
reopening of his 2000 claim (Tr. 15).

[2]

    Citations to "T.___" refer to the separately-bound two-volume administrative
record titled "Court Transcript."

Law Judge ("ALJ") denying benefits. See 20 C.F.R. §§ 416.305, 416.330, 416.1455, 416.1481.

After his September 2003 application for SSI was denied, Plaintiff requested and was granted a hearing before an ALJ (Tr. 51-52). Following a hearing held on July 18, 2005, the ALJ found McAninch not disabled and denied benefits.

Plaintiff, represented by counsel, eventually sought relief in this Court. See McAninch v. Barnhart, 06-CV-0268(MAT)(HBS) (W.D.N.Y.). This Court, adopting the Report and Recommendation of Magistrate Judge Hugh B. Scott, determined that the ALJ did not fully consider all of Plaintiff's mental conditions-including his alleged low I.Q., learning disabilities, and personality disorders-in determining that he was capable of working. In addition, the ALJ did not evaluate whether, in light of those impairments, Plaintiff would be disabled in the absence of his alcohol abuse. Of particular concern was the ALJ's failure to adequately consider the report of Dr. Sharma indicating that Plaintiff suffered from a learning disability and personality disorders that were independent of his alcoholism. Finally, the Court found the record from the first hearing unclear as to whether the ALJ considered the report of Dr. Esat Cirpili (treating physician) and Mr. Peter Tarbake R-CSW(treating social worker) as it related to Plaintiff's mental conditions independent of alcohol abuse.

The Court ordered that the case be remanded to the Commissioner for development of the record with respect to the existence and severity of Plaintiff's mental conditions related to his alleged learning disabilities, personality disorders, and low I.Q. On remand, the ALJ was directed to consider whether those conditions, when considered independently of Plaintiff's alcohol abuse, constitute a disability under the Social Security Act. See Order Adopting Report and Recommendation dated October 12, 2007 (Docket No. 20 in McAninch v. Barnhart, 06-CV-0268(MAT)(HBS) (W.D.N.Y.)).

A new hearing was held on November 17, 2008 (Tr. 446A-85, 1275-1321) before ALJ Marilyn D. Zahm ("ALJ Zahm" or "the ALJ"), who considered the case de novo. On December 18, 2008, ALJ Zahm issued a written decision determining that Plaintiff was not under a disability as defined in the Act. T.497-510. On October 26, 2009, the Social Security Administration's Appeals Council ("the Appeals Council") denied Plaintiff's request for review, rendering ALJ Zahn's December 2008 decision the Commissioner of Social Security's final decision. T.486-88.

Plaintiff, represented by counsel, instituted the instant action, which has been transferred to the undersigned. Defendant has moved for judgment on the pleadings. See Docket Nos. 9 & 10. Plaintiff submitted a memorandum of law in opposition to Defendant's motion (Docket No. 11), to which Defendant filed a

reply brief (Docket No. 13). The matter is now fully submitted and is ready for decision.

For the reasons that follow, Defendant's motion for judgment on the pleadings (Docket No. 9) is denied, Plaintiff's application is granted, the Commissioner's determination of no disability is reversed, and the matter is remanded for calculation of benefits.

## II. Factual Background

### A. Plaintiff's Educational and Vocational History

McAninch was born February 1, 1973, making him thirty-eight years-old at the present time and a "younger individual" for purposes of the Act's regulations. In 1986, testing at his school indicated that he had a verbal IQ of 90, a performance IQ of 102, and a full scale IQ of 95. It was also determined that McAninch was emotionally handicapped and had a learning disability. T.503 (citations to record omitted).

McAninch dropped out of school at age 16 in 1989 and began working. T.108, 453-55. His only relevant work history is as a drywall finisher (taper) and an unskilled laborer. T.104. His last job was in 2000 as a drywall finisher for a couple of months. T.501, 415. He stopped working because his back pain was "really bad" and he was having "mental issues." T.501. McAninch last looked for work, unsuccessfully, in 2007, at grocery stores, car dealerships, a Wal-Mart, construction sites, and in maintenance. T.501.

### B.   Medical History – Physical Impairments

Since September 29, 2003, the date of the earliest SSI application under review, McAninch has been treated for both physical and mental impairments.  With regard to his physical impairments, McAninch has been treated continuously for spinal pain extending from his neck to his low back by numerous physicians, including Dr. Gosy (T.152-59); Dr. Vullo (T.835, 847, 1086-97), Dr. Stoffman (T.1185-88); Dr. Hamill (T.1081-85); Dr. Bauer (T.392-93); and Dr. Gutterman (T.769). He also has undergone much physical therapy (T.848-60, 1217-40).

Pain management specialist Dr. Gosy treated Plaintiff from December 2002, through December 2003. T.152-59. Based upon Plaintiff's subjective complaints and the physical examination of him, Dr. Gosy diagnosed Plaintiff as having chronic mechanical lower back pain for which he prescribed Baclofen and Hydrocodone. Dr. Gosy evaluated Plaintiff's disability status as anywhere from 25% to 33%.

Because Plaintiff's symptoms did not improve despite receiving physical therapy between 2003 and 2006, see T.848-60, a thoracic and lumbar MRI was ordered in August 2005. At the thoracic level, Dr. Stoffman found a mild left pericentral disc protrusion at C6-C7 and a moderately prominent left pericentral disc protrusion at T7-T8, impinging on the left anterior (front) aspect of the spinal cord at that level. T.795. Dr. Stoffman also noted that the lumbar spine MRI showed a disc herniation at L4-L5 with mild central

stenosis. T.1078. Neither Dr. Hamill nor Dr. Stoffman believed that, given the location of Plaintiff's pain, he was good candidate for surgery. T.804-08, 1186. Accordingly, McAninch continued with physical therapy.

Dr. Nikita Dave, a consultative physician retained by the Administration, examined Plaintiff on June 14, 2006. He noted that Plaintiff was a "vague historian who [did] not have much insight into his medical complaints and conditions." T.888. Dr. Dave noted

> The claimant has constant tightness and severe spasms as well as throbbing through his mid back. It is 8/10. He has radiation bilaterally, left being worse than the right lower extremity, affecting his calves and the top of his feet. Radicular pain is sharp, stinging, and shooting, and is 9/10. He denies numbness, but has pin paresthesias in his left foot. The pain is increased with sitting less than 5 minutes, walking abut ½ block, bending, coughing, lifting. It is decreased by stretching and a slight twisting pull, lying down, medications, heat, PT, and his LS brace.

T.888-89.

Dr. Dave noted that Plaintiff has "help with cooking, cleaning, laundry, and shopping from a friend." T.889. He showers and dresses himself daily, but has difficulty getting into and sitting in a bathtub. T.889. At the time, Plaintiff's medications were as follows: Effexor XR (150 mg twice a day); Trazodone (150 mg every evening); Baclofen (20 mg three times per day); Darvocet-N (100/650 mg every 4 to 6 hours); 5% Lidocaine patch (1 to 3 patches per day); Provigil (200 mg twice a day); and Ultram ER (100 mg per day). T.889. Plaintiff stated that he previously used alcohol but did not anymore.

Plaintiff refused to take off his brace for the physical examination, which showed positive findings of a mildly antalgic gait, a reduced range of motion in the lumbar spine, positive straight-leg-raising tests on the right at 60° and on the left at 50°, and 80°-hip flexion. T.890-91. Dr. Dave found all other strength and range of motion testing to be within normal limits. He observed that Plaintiff was "in moderate distress while sitting" and was "allowed to stand for part of the interview." T.890. Plaintiff did not need assistance getting on and off exam table and was able to rise from his chair. T.890.

Plaintiff's neurological examination was normal. Id. But for Plaintiff's decreased affect and facial expression, Dr. Dave concluded that his mental status screening was "benign." T.891. Dr. Dave observed that Plaintiff required simplification of terms during conversation and while attempting to follow complex instructions. Id. Dr. Dave concluded that Plaintiff had moderate limitations in prolonged sitting, ambulation, lifting, bending, and carrying. T.892.

According to Dr. Dave, Plaintiff's diagnoses were as follows: depression; radicular low back pain; history of traumatic brain injury with unclear degree of injury or impairment; and possible learning impairment based upon psychiatric and IQ report. T.891. Dr. Dave evaluated Plaintiff's prognosis as "[f]air[,]" noting in particular that Plaintiff had "moderate limitations with prolonged sitting, ambulation, bending, lifting, and carrying." T.891-92. He

referred the reader to the "psychiatric and intelligence reports[3] for further limitations for learning disability." T.892.

In November 2006, Plaintiff reported that he had crashed his motorcycle two months previously, fracturing his right foot and aggravating his mid-back pain. T.937, 969, 1091. He was wearing a cast boot on his left foot, had reduced ranges of motion in his cervical and lumbar spines, full strength in his upper extremities, and spine tenderness from the occiput to T12. T.937.

On December 11, 2006, Dr. Vullo evaluated Plaintiff and determined that he could occasionally lift/carry up to 20 pounds, and frequently lift/carry up to ten pounds. Dr. Vullo noted that Plaintiff's standing and walking were impaired due to a fractured foot, and that his bending was impaired due to a back brace. T.933-35, 970-72. Dr. Vullo opined that Plaintiff was "not totally disabled" but rather was "partially disabled." T.935. She noted that his left foot condition was temporary and would resolve. Id.

In August 2007, Dr. Danaher opined that in light of his physical impairments, Plaintiff could do sedentary work; specifically, he could lift ten pounds occasionally, stand and/or walk two hours a day, and sit for six hours a day. T.1148. Back pain would reduce his pace and production, and he should avoid ladders and extended periods of driving. T.1147-48.

---

[3] Dr. Dave appears to be referring to the report of consultative psychologist Dr. Thomas Ryan who also evaluated Plaintiff in June 2006.

On a referral from Dr. Danaher, Plaintiff's general practitioner, Dr. Stoffman, a neurologist, examined Plaintiff in August and September or 2008. T.1185-94, 1077-79. Physical examinations were normal with findings including normal motor testing throughout all muscle groups, normal sensory examination, negative straight leg raises, and a spine that was without deformity, non-tender to palpation, and with a normal range of motion. T.1185, 1188. An August 2005 lumbar spine MRI showed a disc herniation at L4-5, causing mild central stenosis; an August 2005 thoracic spine MRI showed mild disc protrusion at T6-7 and T7-8. T.1188, 1193-94. September 2008 cervical and lumbar MRIs showed no significant disc herniation, central lateral recess, or foraminal stenosis. T.1185, 1189-92.

## C.   Medical History – Mental Impairments

### 1.   2001 Report of Dr. Sharma (Consultative Psychologist)

Dr. Sharma, a consultative psychologist for the Commissioner, examined Plaintiff on April 10, 2001.[4]  At the time, he was living with his girlfriend and her two children, and was able to help with household chores.

Dr. Sharma's tests indicated that McAninch had a verbal IQ of 91, a performance IQ of 85, and a full scale IQ of 88, placing him in the low average range of intellectual functioning. T.415.

---

[4]
The report prepared by Dr. Sharma was specifically required to be considered by the ALJ, pursuant to this Court's remand order.

Dr. Sharma also found signs of a learning disability, which was consistent with the testing performed by school officials in 1986.[5] He was able to read at the 7.8 grade level and spell at the 5.2 grade level. T.415. Dr. Sharma opined McAninch "may have a problem in concentration, memory and ability to get along with others due to his poor attention span and personality problems." T.416. Dr. Sharma's Axis I diagnosis was Attention Deficit Hyperactivity Disorder ("ADHD"); Learning Disorder, Not Otherwise Specified ("NOS"); and Alcohol Dependence in Remission. T.416. The Axis II diagnosis was Personality Disorder, NOS with Antisocial Traits. Id.

Dr. Sharma opined that McAninch's prognosis was "poor" since he was not receiving any psychiatric medication or counseling for his ADHD. T.416. The prognosis for his learning disability and personality problems was "also poor since they both tend to persist." Id. Dr. Sharma concluded that McAninch did have the judgment to manage his own finances provided that he controlled his drinking. Id.

### 2.   Niagara County Department of Mental Health

McAninch received no treatment for his depression or other mental impairments until November 2004, when he self-referred to Niagara County Department of Mental Health ("NCDOMH"). He has been treated there ever since by staff psychiatrists (including Drs. Syed Farooq, Esat Cirpili, and Daniel Willis) and social

---

[5]

The Court notes that in the years between the two tests, McAninch's full scale IQ dropped 7 points.

workers (including Peter H. Tarbrake, R-CSW). The initial impression was depressive disorder, NOS, with personality disorder traits, characterized by isolation and depression. T.233. McAninch complained of hypersomnia, lack of appetite, anhedonia, and social isolation. His GAF ranged from 45 to 56. T.239, 242, 245, 246. Over the seven months following his initial visit, the progress notes showed ongoing depression with anhedonia with only marginal to moderate progress. T.242.

In July 2005, Dr. Cirpili replaced Dr. Farooq as Plaintiff's psychiatrist, and completed a medical assessment of his mental ability to do work-related activities for the Niagara County Department of Social Services. T.262-63, repeated at 684-85. According to Dr. Cirpili, the only area in which McAninch demonstrated "good" ability to function was that of maintaining his personal appearance; in all other areas, Dr. Cirpili estimated McAninch's abilities to be "fair" at best. In many areas (e.g., reliability, remembering and carrying out complex job instructions, interacting with supervisors, dealing with work stressors, and maintaining attention and concentration), Dr. Cirpili considered him to have "poor" or "no ability" to function. T.262-63.

McAninch continued with a working diagnosis of generalized anxiety disorder and depressive disorder NOS, with difficulties in managing his anger. T.861-77, 946-60, 986-94. The progress notes from the psychiatrist and social worker do not show improvement in his depression but instead show increasing depression, secondary to

-11-

his back pain. T.815-19. With the exception of two brief periods in July 2005, and February 2006, when his GAF increased to above 60, McAninch's condition remained essentially unchanged. In March 2006, for instance, Dr. Cirpili noted that Plaintiff was dysthymic with a low level of depression secondary to his medical conditions. T.815.

### 3. Niagara County Mental Health Services – Dr. Willis' April 2006 Report

On April 11, 2006, Dr. Willis evaluated Plaintiff at the NCDOMH and completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental)", see T.657-58. Dr. Willis found that Plaintiff had a "marked"[6] limitation in his ability to understand and remember short, simple instructions. T.657. Dr. Willis also observed that Plaintiff had "extreme" limitations in carrying out short, simple instructions; understanding, remembering, and carrying out detailed instructions; and in making simple, work-related judgments and decisions. Dr. Willis indicated that Plaintiff's impairments affect his abilities in the foregoing areas. Id.

Dr. Willis listed McAninch's diagnoses as depressive disorder NOS, generalized anxiety disorder, chronic back pain, serious back and arm injuries, social isolation, life direction problems, and a GAF of 53. T.657. Dr. Willis stated that McAninch's symptoms

---

[6] This form defines "marked" as demonstrating a "serious limitation" in the given area, such that the "ability to function is severely limited but not precluded." T.657. "Severe" is defined as a "major limitation" in the given area, such that "[t]here is no useful ability to function in this area." Id.

included depressed and anxious mood with irritability, agitation, difficulty with concentration and memory, anhedonia, explosiveness, and opined that McAninch's "distress was intensified by [his] physical problems." T.657.

Dr. Willis rated as "extreme" McAninch's restrictions in his abilities to interact appropriately with the public, with supervisors, and with co-workers; to respond appropriately to work pressures and changes in a routine work setting. T.658. In support of this, Dr. Willis noted, "Ronald at times has difficulty attending to a 30-45 minute counseling session and has walked out, easily overwhelmed and [has] verbally escalated [the situation], [and] misinterprets information." T.658.

Dr. Willis responded "N/A" (not applicable) the question asking whether the claimant's alcohol and/or drug abuse contributed to the limitations set forth above on the form. T.658

### 4.  Consultative Psychologist Dr. Thomas Ryan's June 2006 Report

In early June 2006, on or around the date that Dr. Dave evaluated Plaintiff's physical impairments, consultative psychiatrist Dr. Ryan evaluated Plaintiff's mental functioning at the Commissioner's request. According to Dr. Ryan, McAninch was cooperative, and his "manner of relating, social skills, and presentation were adequate." T.885. With regard to his attention and concentration, Dr. Ryan found McAninch "[mildly impaired" with "some limits in intellectual functioning." T.886. Dr. Ryan assessed his recent and remote memory skills as "[generally intact." T.886.

With regard to cognitive functioning, Dr. Ryan rated McAninch as being in the "[borderline range based on today's test results" with a "limited" "[general fund of information[.]" T.886. According to Dr. Ryan, McAninch's insight was "[p]oor" and his judgement was "[p]oor due to impulsivity." Id.

> Dr. Ryan's stated, in summary, that McAninch could
>
> follow and understand simple directions, perform simale tasks, and he can maintain attention and concentration. He can maintain a regular schedule unless physical condition interferes. He would be slow to learn new tasks. He would have difficulty with complex tasks. His decision making is impaired. He has difficulty, at times, dealing with others and dealing with stress.
>
> Results of the evaluation are consistent with psychiatric and cognitive problems which may interfere to some degree on a daily basis.

T.886.

Dr. Ryan gave an Axis I diagnosis of depressive disorder, NOS; an Axis II diagnosis of borderline intellectual functioning; and an Axis III diagnosis of degenerative disk disease and herniated disks. T.886-87.  McAninch's prognosis, in Dr. Ryan's view, was "[s]omewhat guarded given the overall nature of his condition and history." T.887.

### 5. Niagara County Department of Mental Health – Dr. Cirpili's October 2006 Report

Dr. Cirpili completed a psychiatric report and mental RFC assessment in October 2006 at the request of the Commissioner. See T.924-30.  Dr. Cirpili indicated that McAninch demonstrated deficiencies in all areas of task performance and concentration (independent functioning, concentration, persistence in tasks,

ability to complete tasks in a timely manner, pace, and ability to assume increased mental demands associated with competitive work." T.925. When asked how those deficiencies manifested themselves, Dr. Cirpili stated that McAninch had been "fired/let go from several jobs, due to physical & mental health problems." T.925. Dr. Cirpili indicated that "most or all" of the above deficiencies interfered either continuously or intermittently with Plaintiff's ability to function in those areas. T.925.

With regard to any repeated episodes of deterioration or decompensation in work, work-like settings or elsewhere, Dr. Cirpili stated that McAninch had "too many to list" as his "history goes all the way back to special ed." T.925. Dr. Cirpili indicated that McAninch, either continuously or intermittently, in stressful situations, has displayed an inability to appropriately accept supervision; exacerbation of signs of illness; exacerbation of symptoms of illness; deterioration from level of functioning; decompensation; poor attendance; superficial or inappropriate interaction with peers; inability to cope with schedules;[7] poor decision making; and inability to adapt to changing demands of context. T.926. When asked to explain and, if possible, give specific instances of the foregoing, Dr. Cirpili noted that McAninch has either withdrawn socially or exploded at the office or at work due to his condition. T.926.

---

[7]

McAninch's poor attendance and inability to cope with schedules are evidenced by his history of repeatedly missing appointments with various health care providers, including Niagara County Mental Health Services.

With regard to difficulties in maintaining social functioning, Dr. Cirpili stated that McAninch has exhibited marked difficulty in functioning independently, appropriately, and/or effectively in the following areas: communicating clearly and effectively; getting along with family, friends, and neighbors; showing consideration for others; cooperating with others and co-workers; responding to supervisors and those in authorities; establishing interpersonal relationships; holding a job; avoiding altercations; and interacting and actively participating in group activities. T.924-925. Dr. Cirpili pointed specifically to McAninch's history of explosiveness, lack of social skills, social isolation; and history of failed employment attempts. T.925. The only areas of social functioning in which Dr. Cirpili did not rate McAninch as having "marked" difficulties were displaying awareness of others' feelings; exhibiting social maturity; and responding without fear to strangers. T.925.

On the Residual Functional Capacity Questionnaire ("RFC Questionnaire") for Psychiatric Disorders, Dr. Cirpili indicated the following with regard to Plaintiff's diagnoses: "Axis I, [DSM] 311.00 depressive disorder NOS; Axis II, pd [personality disorder] NOS traits; Axis III, serious back & lower arm injury; Axis IV, social isolation; and Axis V 45/50 [on GAF scale]". T.927. Dr. Cirpili described McAninch's symptoms as follows: "depressive symptoms are manifest (anhedonia) w/ some anxiety and explosiveness

exacerbated by his physical problems". T.927. With regard to his prognosis, Dr. Cirpili stated "guarded / stable [?]".

On Part B of the RFC Questionnaire, Dr. Cirpili rated Plaintiff's restrictions in areas of daily living as marked;[8] his difficulties in maintaining social functioning as extreme; his deficiencies of concentration, persistence, or pace resulting in a failure to timely complete tasks as marked; and his episodes of deterioration or compensation causing Plaintiff to withdraw or experience exacerbation of signs and symptoms as "continually experienced." T.928-29.

With regard to McAninch's anxiety disorder, Dr. Cirpili answered affirmatively the question asking whether the disorder rendered McAninch completely unable to function independently outside the area of the home. T.929.

On Part C of the RFC Questionnaire, Dr. Cirpili rated Plaintiff's limitation in ability to understand, remember, and carry out instructions as "marked"; and his limitation in ability to respond appropriately to supervision as "severe", noting Plaintiff's "frequent explosive behavior mixed [?] w/ social withdrawal". T.929. Dr. Cirpili stated that Plaintiff had a "marked" limitation in ability to respond appropriately to co-

---

[8]

The RFC Questionnaire defines a "marked impairment" as one that "seriously affects the ability to function", while a "severe impairment precludes the ability to function." T.929. The RFC Questionnaire explains that a "marked" impairment "may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the individual's ability to function independently, appropriately, effectively, and on a sustained basis." T.929. "Marked limitations constitute listing level impairments." Id.

workers; a "severe" limitation in ability to satisfy an employer's normal quality, production, and attendance standards; a "severe" limitation in ability to respond to customary work pressures; a "severe" limitation in ability to perform complex tasks on a sustained basis in a full-time work setting; and a "marked" limitation in ability to perform simple tasks on a sustained basis in a full-time work setting. T.930. Dr. Cirpili additionally commented that Plaintiff "presents a combination of affective impairment[s] (depression & anxiety), feeling mtg [management?] problems (explosiveness)[,] exacerbated by very serious physical problems." T.930.

## III. General Legal Principles Applicable to Social Security Cases

### A. Standard of Review Applied by the District Court to the Commissioner's Disability Determinations

District courts reviewing a disability decision of the Commissioner can affirm, reverse, or modify that decision, "with or without remanding . . . for a rehearing." 42 U.S.C. § 405(g); see also Butts v. Barnhart, 388 F.3d 377, 385 (2d Cir. 2004). T h e Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." Valente v. Secretary of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

The first step of the review entails deciding "whether [the agency] applied the correct legal principles in making the

determination." <u>Johnson v. Bowen</u>, 817 F.2d 983, 985 (2d Cir. 1987). Second, the Court must ascertain "whether the determination is supported by 'substantial evidence.'" <u>Id.</u> (quoting 42 U.S.C. § 405(g)). Thus, the Commissioner's determination may only be reversed if the correct legal standards were not applied, or the decision was not supported by substantial evidence. <u>Halloran</u>, 362 F.3d at 31 (citing <u>Balsamo v. Chater</u>, 142 F.3d 75, 79 (2d Cir. 1998)).

### B.   Disability Determinations

#### 1.   Eligibility For Benefits

A claimant must establish that he was disabled within the meaning of the Act prior to the expiration of his insured status, 42 U.S.C. §§ 423(a)(1)(A), 423(c), meaning that he suffered from an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The effect of the physical or mental impairment must be

> of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

<u>Id.</u>, § 423(d)(2)(A).

### 2.    The Five-Step Evaluation Process

The Commissioner must apply a five-step procedure to assess disability claims. See 20 C.F.R. § 404.1520(a)(4); see generally, e.g., Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). The Second Circuit has explained the process as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam) (citing 20 C.F.R. §§ 416.920, 404.1520).

### 3.    Additional Steps Required for Determination of Disability Based on Mental Impairments

When evaluating the severity of mental impairments, the regulations require the ALJ to apply a "special technique" at the second and third steps of the review, in addition to the customary sequential analysis, as well as at each level of administrative review. 20 C.F.R. § 404.1520a(a). Kohler v. Astrue, 546 F.3d 260,

265-66 (2d Cir. 2008) (citing 20 C.F.R. § 404.1520a). First, the ALJ must determine whether the claimant has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1). Second, if a mental impairment is present, the ALJ must rate the degree of the claimant's resultant functional limitations in four areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of deterioration or decompensation at work or in work-like settings. 20 C.F.R. § 404.1520a(c)(3). The degree of functional loss resulting from the impairment must be rated on a scale ranging from "no limitation" to "severe limitation", "which is incompatible with the ability to do work-like functions." Martone, 70 F. Supp.2d at 149 (citing 20 C.F.R, §§ 404.1520a(b)(3), 416.920a(b)(3)). Importantly, the ALJ must document "a specific finding as to the degree of limitation in each of the functional areas." 20 C.F.R. § 404.1520a(e)(2); see also Kohler, 546 F.3d at 266-67.

The next steps involve determining the severity of the mental impairment and whether it meets or equals a listed mental disorder. 20 C.F.R. §§ 404.1520a(c), 416.920a(c). A mental impairment is generally found not severe if the degree of limitation in the first three areas is mild or better and there are no episodes of decompensation. 20 C.F.R. § 404.1520a(d)(1).

"If the claimant's mental impairment is severe, the reviewing authority will first compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental

disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder." Kohler, 546 F.3d at 266 (citing 20 C.F.R. § 404.1520a(d)(2)). If so, the claimant will be found to be disabled. If not, the ALJ will assess the claimant's residual functional capacity. Id. (citing 20 C.F.R. § 404.1520a(d)(3)).

### C.   Residual Functional Capacity

"A prima facie case of disability is established when the claimant shows that he is unable to perform his past employment because of his impairments." Dumas v. Schweiker, 712 F.2d 1545, 1551 (2d Cir. 1983). To rebut a prima facie case of disability, the Commissioner "must prove the existence of alternative substantial gainful activity in the national economy which the claimant is capable of performing." Id. (citing Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980)).

What an individual "can still do despite his or her limitations" is the residual functional capacity ("RFC") and is, ordinarily, the "individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, 1996 WL 374184, at *2 (SSA July 2, 1996)).

In making an RFC determination, the ALJ must "consider[ ] all relevant evidence, consisting of, inter alia, physical abilities, symptoms including pain, and descriptions, including that of the claimant, of limitations which go beyond symptoms." Marton v. Apfel, 70 F. Supp.2d 145, 150 (N.D.N.Y. 1999) (citing 20 C.F.R. §§ 404.1545; 416.945). "Age, education, past work experience, and transferability of skills are vocational factors to be considered." Id. (citing ). A claimant's physical abilities are determined by evaluating his exertional and nonexertional limitations in performing a certain category of work activity on a regular and continuing basis. Id. (citing 20 C.F.R. §§ 404.1545; 416.945; 404.1567; 404.1569a; 416.967; 416.969a).

With regard to mental abilities, the regulations provide as follows:

> When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce your ability to do past work and other work.

20 C.F.R. § 404.1545(c) (emphasis supplied). An RFC finding must represent a function-by-function assessment of a claimants's abilities. 20 C.F.R. §§ 404.1545, 416.945.

## IV.  Analysis of the ALJ's Decision

### A. Substantial Gainful Activity

The ALJ concluded that Plaintiff had not engaged in any substantial gainful employment, i.e., "work that involves doing significant productive physical or mental duties . . . for pay or profit[,]" 20 C.F.R. §§ 404.1510, 416.910, since the alleged onset date of his disability. This finding is not disputed.

### B.   Severe Physical or Mental Impairment(s)

Next, the ALJ determined whether McAninch has a severe physical or mental impairment, or combination of impairments, significantly limiting his ability to do "basic work activities," which are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b).[9] A physical or mental impairment is considered "severe" if it "significantly limit[s]" the applicant's physical and mental ability to do such basic work activities. 20 C.F.R. §§ 404.1521(a), 416.921(a).

The ALJ concluded that the medical evidence showed that Plaintiff has severe mental impairments consisting of borderline intellectual functioning, depression, and generalized anxiety disorder. T.499 (citing 20 C.F.R. § 416.921 et seq.). The ALJ determined that Plaintiff suffers from the following severe

---

[9]

"Basic work activities" include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out, remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b).

physical impairments: thoracic spine disorder and neck pain. T.499. Plaintiff does not contest these findings.

The ALJ correctly noted that McAninch's appeal involved only his mental limitations apart from his substance abuse, and his ability to perform "substantially [sic] light work, exertionally [sic], was not contested." The ALJ concluded that

> [b]ased upon the consultative medical examiners['] reports and the review physician's evaluation and the academic levels [sic] testing that was done, I find that the claimant can perform simple work with occasional interaction with others which does not require more than a 7.8 grade level reading ability, a 5.2 grade level spelling ability, and an 8.9 grade level math ability.

T.506.

## C.   Whether Plaintiff's Impairments Are Listing-Level

The third step requires determining whether any of a claimant's impairments are listed in the regulations at Appendix 1 of 20 C.F.R. Pt. 404, Subpt. P ("the Listing").

### 1.   Mental Impairments

The relevant listed mental impairments in the present case include 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.04 (Affective Disorders) ("§ 12.04") for Plaintiff's depressive disorder; id., § 12.06 (Anxiety Disorders), for Plaintiff's generalized anxiety disorder; id., § 12.05 (Mental Retardation), for Plaintiff's learning disabilities and low intelligence quotient ("I.Q."); and id., § 12.02 (Organic Mental Disorders), for Plaintiff's ADHD.

Disabilities that fall under the umbrella of 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.02 include disorientation to

-25-

time and place; short- or long-term memory impairment; perceptual or thinking disturbances, _e.g._, hallucinations or delusions; personality changes; mood disturbances; emotional lability and impairment in impulse control; and loss of measured intellectual ability of at least 15 IQ points[10] or an overall impairment index clearly within the severely impaired range on neuropsychological testing. 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.02.

To meet the criteria of 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.05(C), a claimant must show (1) below average intellectual function with adaptive functioning deficits manifested before age 22 and continuing during the claim period, (2) a valid IQ score of 60 through 70, and (3) an impairment, other than his low IQ, that imposes "an additional and significant work-related limitation of functioning." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C).

Section 12.06(A)(1) of 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 lists the following criteria: "1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms: (a) motor tension, (b) autonomic hyperactivity, (c) apprehensive expectation, and (d) vigilance and scanning." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06. Section 12.06(A)(5)

---

[10]

In 2006, Dr. Thomas Ryan, a physician for the Commissioner, performed IQ testing on McAninch, who only scored 77 on the full scale intelligence quotient("FSIQ") test. When he was first tested in high school, McAninch's FSIQ was 95. Thus, McAninch sustained an 18-point drop in his FSIQ. As the ALJ found, this placed him in the borderline range of intellectual functioning. T.503 (citations to record omitted). Reading testing indicated his abilities to be at the sixth-grade level. _Id._

requires that a claimant provide medical documentation of "Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress." Id. Section 12.06(B) enumerates the following restrictions: (1) Marked restriction of activities of daily living; (2) marked difficulty in maintaining social functioning; (3) marked difficulty in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. Id.

20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.04 states that an affective disorder is "characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. Pt. 404, Subpt. P, Appendix ("App.") 1, § 12.04. To be disabled under § 12.04, the claimant's disorder must meet the severity levels of both subsections § 12.04A and § 12.04B, or subsection § 12.04C. Id. To be disabled based on § 12.06, the claimant's anxiety disorder must meet the criteria of both § 12.06A and 12.06B, or both § 12.06A and 12.06C. Id., §§ 12.02, 12.06.

Section 12.04 of 20 C.F.R. Pt. 404, Subpt. P, App. 1, provides that for a mental impairment to be considered a disability, a claimant's symptoms must meet the following criteria:[11]

    A.   Medically documented persistence, either continuous or intermittent, of one of the following:

        1. Depressive syndrome characterized by at least four of the following:

---

[11]    Only the criteria in 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.04 pertinent to McAninch's diagnoses are listed here.

    a.   Anhedonia or pervasive loss of interest in
         almost all activities; or
    b.   Appetite   disturbance   with   change in
         weight; or
    c.   Sleep disturbance; or
    d.   Psychomotor agitation or retardation; or
    e.   Decreased energy; or
    f.   Feelings of guilt or worthlessness; or
    g.   Difficulty concentrating or thinking; or
    h.   Thoughts of suicide; or
    i.   Hallucinations,  delusions  or  paranoid
    thinking;

    . . .

    [the "A Criteria"]

AND

    B. Resulting in at least two of the following:

    1.   Marked restriction of activities of daily
         living; or
    2.   Marked difficulties in maintaining social
         functioning; or
    3.   Marked  difficulties  in  maintaining
         concentration, persistence, or pace; or
    4.   Repeated episodes of decompensation, each
         of extended duration.

    [the "B Criteria"]

    Or

    C. Resulting in complete inability to function
    independently outside area of one's home.

    [the "C Criterion"]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 (emphases supplied).

     Although the ALJ did not explicitly discuss the A criteria,

she implicitly found that McAninch satisfied them, since she

classified his depression (along with his borderline intellectual

functioning and generalized anxiety disorder) as among his "severe"

impairments. Indeed, the medical records establish that McAninch

has experience anhedonia (the pervasive loss of interest in almost all activities); sleep disturbance; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; and thoughts of suicide.

The ALJ confined her analysis to whether McAninch's mental impairments satisfy the B Criteria of listing § 12.04–that is, whether his "mental impairments result in at least two of the following: (1) marked restrictions in activities of daily living; (2) marked restrictions in social functioning; (3) marked restrictions in maintaining concentration, persistence, or pace; (4) repeated episodes of decompensation, each of extended duration." The ALJ concluded that McAninch's borderline intellectual functioning, depression, and generalized anxiety disorder–all of which she deemed "severe impairments"–were not disabilities because they did not meet any of the B Criteria. T.499-500.[12]

In particular, the ALJ concluded that McAninch's "mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration. . . ." T.500. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. The ALJ found that McAninch did not have any "marked" difficulties in any of the relevant three areas but

_____

[12]

The ALJ considered the "C criterion" but found that the evidence failed to establish McAninch was totally unable to function outside of his home. Plaintiff does not appear to contest this finding and, indeed, the record does not support a contrary conclusion.

instead had "mild" difficulties in maintaining social functioning; "moderate" difficulties in maintaining concentration, persistence, or pace; and "mild" difficulties in activities of daily living. T.500. McAninch contends that the ALJ failed to accord the proper weight to the treating sources' opinions regarding the degree of the limitations caused by McAninch's mental impairments.[13]

Thus, the key inquiry is whether the "substantial evidence" supports the ALJ's determination regarding the effect of Plaintiff's impairments on the B criteria, and whether that determination was reached by the application of the correct legal principles. E.g., Pollard v. Halter, 377 F.3d 183, 188-89 (2d Cir. 2004) (citations omitted).

> a.    **The ALJ's Failed To Properly Apply The Treating Physician Rule With Regard To Plaintiff's Mental Health Providers**

The ALJ's finding that the B Criteria of 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.04  were not satisfied directly contradicted the opinions of his treating psychiatrists, Drs. Willis and Cirpili. Thus, on the crucial question of whether the B Criteria were met, the ALJ did not give the opinions of McAninch's treating physicians controlling weight.

Under 20 C.F.R. § 416.927(d)(2), the ALJ can give the treating physicians' opinions less than controlling weight only if they are not well supported by medical findings or are inconsistent with

---

[13]    The ALJ found no "repeated episodes of decompensation", a finding which McAninch does not dispute.

other substantial evidence in the record, and the ALJ must provide "good reasons" for rejecting them as controlling. E.g., Halloran v. Barnhart, 362 F.3d at 33. Disregarding the "treating physician" rule is itself a sufficient basis for remand. E.g., Hankerson v. Harris, 636 F.2d 893, 896 (2d Cir. 1980); see also Pollard, 377 F.3d at 189 ("Failure to apply the correct legal standards is grounds for reversal.") (internal quotation marks and citation omitted).

Here, the ALJ determined that "[l]ittle weight" should be given to the reports by Drs. Cirpili and Willis because they "appear, based on handwriting, to have been completed by Peter Tarbrake, a social worker, rather than by a medically trained professional." T.505. The ALJ decided that it did not appear Drs. Cirpili and Willis "prepared the reports and they refused to provide the basis for the statements and the evaluations submitted." Id.

As an initial matter, the ALJ is correct to the extent that the treating physician rule does not extend to the opinions of non-physician medical sources such as physician's assistants, nurse practitioners and licensed certified social workers. See Genier v. Astrue, No. 07-1727-cv, 298 Fed. Appx. 105, 2008 WL 4820509, at ** (2d Cir. Nov. 5, 2008) (unpublished opn.) ("[N]urse practitioners and physicians' assistants are defined as 'other sources' whose opinions may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned

controlling weight. 20 C.F.R. § 416.913(d)(1). Therefore, while the ALJ is certainly free to consider the opinions of these 'other sources' in making his overall assessment of a claimant's impairments and residual abilities, those opinions do not demand the same deference as those of a treating physician.") (citing Mongeur v. Heckler, 722 F.2d 1033, 1039 n. 2 (2d Cir. 1983)). However, the Court has found no authority for the proposition that the ALJ can reject their opinions out of hand simply because they are not physicians.

Furthermore, the ALJ committed an error of law by rejecting the opinions of treating physicians, Drs. Cirpili and Willis, on the basis that her "handwriting analysis" indicated that they did not prepare the pertinent report. Accord, e.g., Keith v. Astrue, 553 F. Supp.2d 291, 300-01 (W.D.N.Y. 2008) (Siragusa, D.J.) ("[I]t was improper for the ALJ to discount office notes and reports signed by Nanavati as being merely the opinions of Kubrich.) (citing Santiago v. Barnhart, 441 F. Supp.2d 620, 628 (S.D.N.Y. 2006) ("[T]he ALJ completely disregarded Nunez's opinion that Santiago's depression met the B Criteria on the ground that Nunez expressed his view by signing a report that the ALJ believes was written by Malinowska. However, even if the ALJ's handwriting analysis is accurate and the report was written by Malinowska, there is no reason to believe that the report Nunez signed does not reflect his own view.")).

There is no legal principle which states that a doctor must personally write out a report that he or she signs in order for it to be accorded controlling weight. <u>Santiago</u>, 441 F. Supp.2d at 628 (citing <u>Ruiz v. Apfel</u>, 98 F. Supp.2d 200, 209 (D. Conn. 1999) (holding that ALJ must give weight to a report signed by doctor even though it was prepared by someone else)); <u>accord</u> <u>Keith</u>, 553 F. Supp.2d at 301. Since Drs. Willis and Cirpili signed their names to the respective reports and there is no evidence indicating that the reports do not represent their opinions, the ALJ erred in discounting Drs. Willis' and Cirpili's opinions on this basis alone. <u>Santiago</u>, 441 F. Supp.2d at 628; <u>accord</u> <u>Keith</u>, 553 F. Supp.2d at 301 (holding that to extent the record in social security disability benefits case contained notes of claimant's social worker which her treating psychiatrist did not sign, ALJ erred by failing to give them proper weight; social worker qualified as a medical source, and she had treated claimant for an extended period of time; further holding that ALJ erred by discounting the office notes and opinions signed by claimant's treating psychiatrist on basis that they were merely the opinions of a social worker).

Here, even if the ALJ's handwriting analysis is accurate and the reports were written by Social Workers Tarbrake and McFadden, respectively, there is no reason to believe that the reports Dr. Cirpili and Dr. Willis signed do not reflect their own views. <u>Santiago</u>, 441 F. Supp.2d at 628 ("[T]he ALJ completely disregarded

Nunez's opinion that Santiago's depression met the B Criteria on the ground that Nunez expressed his view by signing a report that the ALJ believes was written by Malinowska. However, even if the ALJ's handwriting analysis is accurate and the report was written by Malinowska, there is no reason to believe that the report Nunez signed does not reflect his own view.").

>           **b.    The ALJ's Improperly Assumed An Adversarial Role in Rejecting the Treating Physicians' Reports.**

The ALJ in McAninch's case also rejected the reports of treating physicians Drs. Willis and Cirpili because they failed to return extremely extensive questionnaires prepared by the ALJ requesting additional information. The ALJ commented,

> I sent requests for clarification of specific questions to both Mr. Tarbrake and Dr. Cirpili . . . about the claimant's functioning and his activities, as the treatment notes in fact show that he shops, has friends, has a girlfriend, walks the dog, rides a motorcycle, takes the bus, goes to drag races, works on trucks, and visited out West. In short, the claimant's own treating sources' treatment notes contradict the checkmarks placed on forms by both Dr. Cirpili and Mr. Tarbrake. No answers were received.  (Exhibits E-24 & E-25).
> . . .
> It is unclear as to how long Dr. Willis had been treating the claimant or how he reconciled various discrepant information, as he did not respond to the questionnaire I sent him anymore [sic] than did the claimant's other treating sources (Exhibit B-23E). I note the same information was requested from Dr. Cirpili . . . but once again he did not respond.
> . . .
> Little weight is given to the reports of Drs. Cirpili and Willis, as . . . they refused to provide the basis for the statements and evaluations submitted. Even less weight is given to the report of Mr. Tarbrake, who is not a medical professional, and who also refused to provide

answers to questions about his report and the claimant's
functioning.

Decision at 9, T.505. The comments quoted above leave no doubt that
the ALJ penalized McAninch for his treating sources' failure to
complete and return the ALJ's questionnaires. The ALJ did not
explain to the physicians why the questionnaires were being sent
and, moreover, the doctors had already complied with all of the
Administration's requests for documentation. Dr. Cirpili, for
instance, timely completed and returned the "Psychiatric Report"
form sent to him. See T.924-930. This form, which is 7 pages long,
included narrative questions as well as questions that required the
provider to check the appropriate box to describe the claimant's
various limitations. See id. No questions were unanswered and no
areas were left blank. Id.

The ALJ's follow-up questionnaire included 59 questions
requesting detailed narrative answers. A sampling follows:

1.    Did you complete these forms, as they do not appear
      to be in your handwriting?

2.    When did you first treat Mr. McAninch? How many
      times have you seen him?

3.    What is his diagnosis?

4.    Does Mr. McAninch have a history of alcohol
      dependence? Substance abuse? When?

      Has Mr. McAninch used alcohol since you began
      treating him? When and how much?

5.    Who changed the GAF [Global Assessment of
      Functioning] on 12/9/04? Why was it changed? (copy
      attached)

6.  Your statement of 7/05 shows that Mr. McAninch had a good ability to maintain his personal appearance. Your statement of 2/08 shows that he has marked difficulty with grooming. When did his ability change? How long did the change last? What impairment limits him in his grooming ability? Please make reference to specific treatment notes?

7.  Your statement of 2/08 shows that Mr. McAninch has marked difficulty with paying bills, maintenance, using public transportation, shopping, planning daily activities and initiating and participation [sic] in activities independent of supervision or direction.

    Who supervises and directs him in his activities?

    You indicate that these limitations are a result of "symptoms and physical mobility/pain management problems."

    Please describe what limitations he has in the above activities as a result of his mental impairments only. Please be specific. Please include the extent of the limitations that are attributed to his mental impairments.

. . .

T.661. Some of these questions, such as those relating to McAninch's alcohol dependence and treatment, and his psychiatric diagnosis, were answered by other treating sources, the consultative physicians, or otherwise are evident based upon information in the record. Thus, many of the inquiries contained in the ALJ's questionnaires were redundant.

Several of the questions posed by the ALJ to Dr. Cirpili have as many as 15 subparts:

9.  You checked the boxes on the form in July 2005 indicating that Mr. McAninch has a [sic] no useful ability to follow work rules, use judgment, and maintain attention and concentration. You also checked the boxes that he had seriously limited

ability to understand, remember and carry out simple job instructions.

What impairment limits his ability as stated above?

How did you determine that he has limitations in this area? Please cite to specific treatment notes.

When did he first become so limited? Has he been so limited since that date, or is his ability only sporadically limited?

Is he regularly compliant with all treatment requirements, including medication?

Mr. McAninch has IQ scores of V91, P 85 and FS 88. His ability to read has been tested as at the 7.8 grade level and his spelling at the 5.2 grade level. Can he perform unskilled work and perhaps some semi-skilled work with this profile? If not, please explain. If he has other intellectual limitations, please set them forth and provide support for them.

Does Mr. McAninch have sufficient ability to drive?

Does Mr. McAninch have sufficient ability to operate a snowmobile?

Does Mr. McAninch have sufficient ability to take the bus?

Does Mr. McAninch have sufficient ability to take GED classes?

Does Mr. McAninch have sufficient ability to wash cars to complete a court-required sentence?

Does Mr. McAninch have sufficient ability to drive?

Does Mr. McAninch have sufficient ability to work on trucks?

Does Mr. McAninch have sufficient ability to travel out West?

Does Mr. McAninch have sufficient ability to go shopping?

Does Mr. McAninch have sufficient ability to complete household tasks?

Does Mr. McAninch have sufficient ability to complete home improvement projects?

Does Mr. McAninch have sufficient ability to perform simple tasks?

. . .

T.661-662. The ALJ sent a questionnaire of similar length and depth to Dr. Willis, see T.652-56. Although the ALJ stated that she sent the same type of questionnaire to Social Worker Tarbrake, the Court has been unable to locate it in the Court Transcript, and it is not listed in the Index.

"[A]n ALJ does not face a claimant such as [McAninch] in an adversarial posture." Peed v. Sullivan, 778 F. Supp. 1241, 1245 (E.D.N.Y. 1991) "Rather, the ALJ has a duty to ensure that the claimant receives 'a full hearing under the Secretary's regulations and in accordance with the beneficent purpose of the [Social Security] Act.'" Id. (quoting Gold v. Secretary of Health, Education, and Welfare, 463 F.2d 38, 43 (2d Cir. 1972) and citing Echevarria v. Secretary of Health and Human Servs., 685 F.2d 751, 755 (2d Cir. 1982)). When an ALJ confronts a claimant with a negative bias and without impartiality, he or she undermines the essentially judicial nature of an ALJ's duties. Accord Peed, 778 F. Supp. at 1245.

There can be no dispute that claimants seeking Social Security benefits are entitled to have a fair and impartial decision-maker, for "a basic element of due process is the right to an impartial

and unbiased adjudication of a claim." Pronti v. Barnhart, 339 F. Supp.2d 480, 492 (W.D.N.Y. 2004) (Larimer, D.J.) (citing Johnson v. Mississippi, 403 U.S. 212, 216 (1971) ("Trial before an unbiased judge is essential to due process.")). "This aspect of due process applies equally in an administrative setting as it does in a judicial forum." Kendrick v. Sullivan, 784 F. Supp. 94, 102 (S.D.N.Y. 1992) (citing Schweiker v. McClure, 456 U.S. 188, 195 (1982) ("As this Court repeatedly has recognized, due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities.") (citing Marshall v. Jerrico, Inc., 446 U.S. 238, 242-43 & n. 2 (1980)); see also Hummel v. Heckler, 736 F.2d 91, 93 (3d Cir. 1984) ("Indeed, the absence in the administrative process of procedural safeguards normally available in judicial proceedings has been recognized as a reason for even stricter application of the requirement that administrative adjudicators be impartial.").

These questionnaires sent by the ALJ demonstrate that the ALJ took on an extremely adversarial stance vis-à-vis Plaintiff, contrary to the letter and the spirit of the law. See Gold, 463 F.2d at 43 ("Hearings under the Social Security Act are non-adversary[.]") (citation omitted); Pronti, 339 F. Supp.2d at 492 ("If, in fact, the ALJ holds a general bias against Social Security claimants, this strikes at the very core of due process."). Indeed, the questionnaires amount to the ALJ conducting a "cross-examination" of the Plaintiff's medical providers without

affording Plaintiff or his attorney an opportunity to be present. Plaintiff thus was deprived of the ability to conduct a "re-direct" examination.  Moreover, Plaintiff's attorney was not even provided with a copy of these questionnaires, as there is no indication on the letter that the ALJ mailed copies to anyone, or advised the doctors why additional questions were being asked of them after they had already completed the required forms.

The regulations state that when the evidence received from the claimant's "treating physician or psychologist or other medical source is inadequate for [the Commissioner] to determine" whether the claimant is disabled, the Commissioner will solicit additional information by recontacting the treating sources. 20 C.F.R. § 404.1512(e). According to the regulations, the Commissioner will first recontact the treating sources "to determine whether the additional information . . . need[ed] is readily available" and "will seek additional evidence or clarification . . . when the report from [the claimant's] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 404.1512(e), (e)(1). The regulations indicate that the Commissioner "may do this by requesting copies of your medical source's records, a new report, or a more detailed report from your medical source, including your treating source, or by telephoning your medical source." Id.  Where, as here, there are

no gaps in the claimant's medical records, and the treating physicians' reports do not "contain[ ] a conflict or ambiguity that must be resolved[,]" were not missing necessary information, and were based on medically acceptable clinical techniques, 20 C.F.R. § 404.1512(e)(1), there was no need for the ALJ to develop the record further.

These questionnaires cannot be justified as simply the ALJ's attempt to fulfill her duty to develop the record. See, e.g., Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990) ("The ALJ has a duty to adequately protect a pro se claimant's rights 'by ensuring that all of the relevant facts [are] sufficiently developed and considered.'") (quoting Hankerson v. Harris, 636 F.2d at 895) (alteration in original)). A review of the caselaw demonstrates that the purpose behind requiring the ALJ "'to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts,'" Echevarria, 685 F.2d at 755 (quoting Hankerson, 636 F.2d at 895), is to assist the claimants–especially pro se claimants–not hinder them or attempt to eviscerate their claims. See, e.g., Cruz, 912 F.2d at 11 ("Therefore, when the claimant appears pro se and suffers from ill health, as in this case, the court has 'a duty to make a "searching investigation" of the record' to be sure that the claimant's rights have been properly protected.") (quoting Gold v. Secretary of Health, Educ. & Welfare, 463 F.2d 38, 43 (2d Cir. 1972) (emphases added) (other quotation omitted)).

The Court finds that the ALJ committed a clear error of law and assumed an improper adversarial role by demanding that Plaintiff's treating medical providers answer these extensive questionnaires, which amounted to _ex parte_ cross-examinations and were contrary to the Act's remedial and beneficent purpose of the Act, see _Cruz v. Sullivan_, 912 F.2d at 11 (noting that "the Act must be liberally construed, because it is a remedial statute aimed to include, not exclude"). The apparent hostility and bias of the ALJ's questionnaires, coupled with Plaintiff's absence from the ALJ's "cross-examination" of the treating sources, seriously call into question the fundamental fairness of the proceeding. Reversal or remand is warranted on this basis alone.

       c.    **The ALJ Unjustifiably Rejected the Treating Physicians' Reports as "Inconsistent" with the Consultative Physicians' Reports.**

In rejecting the treating physicians' evaluations regarding the severity of McAninch's mental impairments, the ALJ determined that she should "give great weight to the consultative evaluations and the evaluations of the review physicians" which described as "well-explained, consistent with each other, and consistent with the record as a whole." T.506. There were two consultative reports completed by psychiatrists–Dr. Sharma and Dr. Ryan. The ALJ did not specify who the "review physicians" were but it appears one was Hillary Tzetzko, M.D. Implicit in the ALJ's statements quoted above is her conclusion that she found the consultative physicians' opinions inconsistent with those of the treating physicians.

However, the evaluations by the consultative psychiatrists (Drs. Sharma and Ryan) were not, in fact, inconsistent with those of the treating psychiatrists (Drs. Cirpili and Willis).

In 2001, before McAninch had begun any type of treatment, consultative physician Dr. Sharma evaluated McAninch in connection with a previous claim of disability. She opined that McAninch "may have a problem in concentration, memory and ability to get along with others due to his poor attention span and personality problems". Dr. Sharma characterized the prognoses both for his affective disorders and his learning disability as "poor" since he was not receiving any psychiatric medication or counseling, and his learning disability and personality problems "both tend to persist."

In June 2006, after McAninch had been receiving treatment-including anti-depressant and anti-anxiety medication and one-on-one counseling at Niagara County Mental Health Services-for approximately a year and a half, consultative psychiatrist Dr. Ryan evaluated him. Despite the amount of therapeutic interventions McAninch had received, Dr. Ryan's prognosis for him nevertheless was "[s]omewhat guarded given the overall nature of his condition and history." T.887. Thus, there does not appear to have been a significant improvement in the deficits caused by McAninch's panoply of mental impairments. The Court finds it notable that all of the psychiatrists-treating or consultative-have been consistent

in their diagnoses of depressive disorder, NOS; generalized anxiety disorder; and borderline intellectual functioning.

With regard to the Commissioner's review physicians, "[i]t is well-settled that an opinion based upon a single examination deserves limited weight" Stoesser v. Commissioner of Social Sec., No. 08-CV-643 (GLS/VEB), 2011 WL 381949, at *7 (N.D.N.Y. Jan. 19, 2011) (citing Crespo v. Apfel, No. 97 CIV 4777, 1999 WL 144483, at *7 (S.D.N.Y. Mar. 17,1999) ("In making a substantial evidence evaluation, a consulting physician's opinions or report should be given limited weight" because "they are often brief, are generally performed without benefit or review of the claimant's medical history and, at best, only give a glimpse of the claimant on a single day."). Controlling weight should be given to the opinion of the treating physician especially where, as here, the views of a non-treating physician are solicited solely for the purposes of the disability proceeding itself. Villanueva v. Barnhart, No. 03 Civ. 9021, 2005 WL 22846, at *11 (S.D.N.Y. Jan. 3, 2005) (citing Schisler v. Sullivan, 3 F.3d 563, 567-68 (2d Cir. 1993)).

Dr. Tzetzko's RFC assessment completed at the time of Dr. Sharma's review in May 2001, is not inconsistent with the treating physicians' estimations of the degree of McAninch's deficits. The Court finds it significant that Dr. Tzetzko "hedged" when giving his assessment, stating that Plaintiff "should be able to understand and follow basic work directions in a low contact work setting . . . ." T.433 (emphasis supplied). Tellingly,

Dr. Tzetzko does not state that Plaintiff _is_ able to understand and follow directions, or perform the range of other activities required in a work-setting. "'[T]he opinion of a non-examining consultative physician, without more, [is] insufficient to constitute the requisite contrary substantial evidence' to override the treating physician's assessment." Stoesser, 2011 WL 381949, at *8 (citing Garzona v. Apfel, No. 96 CV 6249, 1998 WL 643645, at *1 (E.D.N.Y. Sept. 18, 1998)). Given the tentativeness of Dr. Tzetzko's assessment, and the fact that he only saw McAninch on one occasion, the ALJ erred in giving controlling weight to his opinion over those of Plaintiff's treating physicians.

> ### d. The ALJ Erroneously Relied on Non-Medical Evidence to Find No Disability Caused by his Mental Impairments.

A running theme throughout the ALJ's decision is the attitude that a claimant must not be disabled if he is not totally and completely incapacitated. See, e.g., T.501, 505 ("I sent requests for clarification of specific questions to both Mr. Tarbrake and Dr. Cirpili . . . about the claimant's functioning and his activities, as the treatment notes in fact show that he shops, has friends, has a girlfriend, walks the dog, rides a motorcycle, takes the bus, goes to drag races, works on trucks, and visited out West."). As an initial matter, the Court is unaware of any rule or regulation requiring that a claimant seeking disability on the basis of a mental impairments be precluded from having friends, a spouse, or a companion. In any event, the relationship to which the

ALJ referred had terminated several years prior to the 2008 hearing.

Furthermore, "it is well-settled that the performance of basic daily activities does not necessarily contradict allegations of disability, 'as people should not be penalized for enduring the pain of their disability in order to care for themselves.'" Stoesser, 2011 WL 381949, at *6-7 (quoting Woodford v. Apfel, 93 F. Supp.2d 521, 529 (S.D.N.Y. 2000) and citing Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998)).  The Second Circuit has "stated on numerous occasions that 'a claimant need not be an invalid to be found disabled' under the Social Security Act." Balsamo, 142 F.3d at 81 ("[A]lthough Balsamo testified that he rarely left his house-"periodically" to attend church and "on an occasion" to help his wife go shopping-the ALJ concluded [erroneously] that Balsamo was not "homebound" because he "owns and operates a motor vehicle when required."); accord Williams v. Bowen, 859 F.2d 255, 260 (2d Cir. 1988); Murdaugh v. Secretary of Health and Human Servs, 837 F.2d 99, 102 (2d Cir. 1988) (claimant who "waters his landlady's garden, occasionally visits friends and is able to get on and off an examination table" nevertheless disabled because could not perform sedentary work).

### e.   Erroneous Determination Of Plaintiff's Residual Functional Capacity ("RFC")

The Commissioner may rely on the testimony of a vocational expert to sustain his burden at step five of showing the existence of substantial gainful employment suited to a claimant's physical

and vocational abilities as long as "there is substantial record evidence to support the assumption upon which the vocational expert based his opinion." Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983). It is undisputed that plaintiff can not perform heavy or medium work as defined by the applicable regulations. The ALJ determined that McAninch could perform some but not all jobs in the category of "light" work.[14]   T.510. Since McAninch's ability to perform a full range of a particular category of work was limited, the ALJ properly used the services of a vocational expert. 20 C.F.R. §§ 404.1566(e), 416.966(e). However, "[t]he vocational expert's testimony is only useful if it addresses whether the particular claimant, with his limitations and capabilities, can realistically perform a particular job." Abeuf v. Schweiker, 649 F.2d 107, 114 (2d Cir. 1981); see also Bapp v. Bowen, 802 F.2d 601, 604-05 (2d Cir. 1986) ("[W]hen a claimant's nonexertional impairments significantly diminish his ability to work, 'the [Commissioner] must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which

---

[14]

The regulations define light work as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

claimant can obtain or perform.'") (quotation omitted).  Thus, the use of hypothetical questions to develop the VE's testimony is permitted, provided that the question incorporates the full extent of a plaintiff's physical and mental limitations.  Dumas, 712 F.2d at 1553-54

Here, in posing the first two hypotheticals (based upon the "light" work and "sedentary"[15] work restrictions, respectively), the ALJ only included one of McAninch's numerous documented mental limitations, which related to his inability to interact with supervisors, co-workers, and the public in a work-setting on a prolonged basis; she gave as a limitation, "occasional interaction with others." T.1316, 1317. The ALJ ignored the remainder of the limitations caused by Plaintiff's mental impairments, such as his inability to maintain concentration and attention and his explosiveness and lack of impulse control when interacting with others in situations he finds stressful.

In the third hypothetical, which incorporated McAninch's testimony regarding his limitations, the ALJ assumed that he would be able to lift up to five pounds; able to stand up to 20 minutes; able to sit up to 30 minutes at a time; never climb, balance, stoop, crouch, kneel or crawl; no moving machinery; occasional reaching, handling, feeling, pushing, and pulling. T.1319. There was only one potential job remaining from the options generated by

---

[15]
    Under the applicable regulations, to perform sedentary work a person must be able to sit for six hours out of an eight hour day and must be able to lift one to ten pounds occasionally. 20 C.F.R. § 404.1567(a).

the previous hypothetical, which was a surveillance system monitor. Id.

The ALJ did not include any of McAninch's mental impairments in the third hypothetical. This was error. See DeLeon v. Secretary of Health and Human Servs., 734 F.2d 930, 936 (2d Cir. 1984) ("In positing hypothetical questions to the vocational consultant, . . . the ALJ did not even present the full extent of De Leon's physical disabilities . . . [and] made no mention, . . . , of De Leon's shoulder or leg problems, or the full implications of his epilepsy. As a result, the record provides no basis for drawing conclusions about whether De Leon's physical impairments or low intelligence render him disabled.").

Plaintiff's counsel added to the third hypothetical the limitation of "frequent interruptions in concentration or memory due to either pain or to psychological symptoms as much as a third to half the day." T.1320. The VE opined that such a person would not be able to perform the job of a surveillance systems monitor and "anything more than 10 percent off task would eliminate that job." T.1320-21. Thus, including McAninch's severe mental impairments into the sedentary hypothetical completely eliminated any possibility of employment within the meaning of the Act.

For some reason that this Court cannot discern, Plaintiff's counsel failed to incorporate the limitation of "frequent interruptions in concentration or memory due to either pain or to psychological symptoms as much as a third to half the day" into the

first two hypotheticals. Notwithstanding this omission by Plaintiff's counsel, the Court concludes that had such limitations (i.e., frequent interruptions in concentration or memory) been part of the hypotheticals involving light work, they would have eliminated the possibility of gainful employment. In other words, it is not reasonable to conclude that "frequent interruptions in concentration or memory due to either pain or to psychological symptoms as much as a third to half the day" would be acceptable in employment involving light work but not sedentary work.

### 2.    Physical Impairments

This Court, in adopting Magistrate Judge Scott's Report and Recommendation to remand McAninch's claim, agreed that "the matter should be remanded to the ALJ "to consider the impact of plaintiff's mental impairments upon his ability to perform work, putting [aside] plaintiff's alcohol use". Thus, as the ALJ noted, this Court did not disturb the findings of the previous ALJ regarding McAninch's physical functioning. Therefore, she adopted the physical residual functional capacity found by the previous ALJ and added it to Plaintiff's mental limitations for purposes of Plaintiff's September 2003 SSI claim.

### D.    Conclusions of Law and Remedy

The Second Circuit has stated that "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that

a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." Johnson, 817 F.2d at 986. Thus, if there exists a reasonable basis for doubting whether the Commissioner applied the appropriate legal standards, the Commissioner's decision may not be affirmed-even if the ultimate decision arguably is supported by substantial evidence. Id. Here, as detailed above, the Court finds more than a "reasonable basis" for concluding the ALJ clearly committed several errors of law.

When a reviewing court concludes that incorrect legal standards have been applied, and/or that substantial evidence does not support the Commissioner's determination, it should be reversed. 42 U.S.C. § 405(g). The court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), particularly if it is necessary to allow the ALJ to develop a full and fair record or to explain his or her reasoning. Martone v. Apfel, 70 F. Supp.2d 145, 148 (N.D.N.Y. 1999) (citing Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980)).

Reversal without remand, although unusual, is appropriate when there is "persuasive proof of disability" in the record and further proceedings would be of no use. Parker, 626 F.2d at 235.

Here, the record establishes that Plaintiff meets the initial criteria under Section 12.04A of 20 C.F.R. Pt. 404, Subpt. P, App. 1, for disability based on depressive syndrome which is characterized by at least four of the following: (a) anhedonia or

pervasive loss of interest in almost all activities; or
(b) appetite disturbance with change in weight; or (c) sleep
disturbance; or (d) psychomotor agitation or retardation; or
(e) decreased energy; or(f) feelings of guilt or worthlessness; or
(g) difficulty concentrating or thinking; or (h) thoughts of
suicide; or (i) hallucinations, delusions or paranoid thinking. 20
C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04A. Plaintiff's treatment
providers' and his testimony notes indicate that he has at least
five out of the nine criteria—persistent anhedonia, difficulty
concentrating or thinking, sleep disturbance, decreased energy, and
thoughts of suicide.

Plaintiff also has demonstrated that he has at least two of
the following: (1) marked restrictions of activities of daily
living; (2) marked difficulties maintaining social functioning;
(3) marked difficulties in maintaining concentration, persistence,
or pace; or (4) repeated episodes of decompensation, each of
extended duration. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.04B
("§ 12.04B"). Specifically Plaintiff meets the criteria of
§ 12.04B(3) and (4), which appear, based upon the treating
physicians' and consultative physicians' evaluations, to be
attributable not only to his depression but also to his borderline
intellectual functioning, ADHD, and generalized anxiety disorder,
see 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.06B. As such,
consideration of Plaintiff's depression, borderline intellectual
functioning, ADHD, and generalized anxiety disorder, in combination

establishes that Plaintiff is disabled. 20 C.F.R. § 404.1523. See Walterich v. Astrue, 578 F. Supp.2d 482, 503, 512 (W.D.N.Y. 2008) (Arcara, J., adopting report and recommendation of Foschio, M.J.) (in determining whether a claimant is disabled, the ALJ is required to address multiple impairments in combination and to consider their cumulative effect as well as the combined effects of nonsevere impairments) (citing Dixon v. Shalala, 54 F.3d 1019, 1031 (2d Cir. 1995) (the SSA must evaluate the "combined impact [of a claimant's impairments] on a claimant's ability to work, regardless of whether every impairment is severe"); Koseck v. Secretary of Health and Human Services, 865 F. Supp. 1000, 1010 (W.D.N.Y. 1994) (citing cases)).

Furthermore, McAninch's treatment records substantiate the finding that he has experienced persistent deficits in adaptive functioning, which "denotes an inability to cope with the challenges of ordinary everyday life." Novy v. Astrue, 497 F.3d 708, 710 (7th Cir. 2007) (citing Diagnostic and Statistical Manual of Mental Disorders-IV 42 (4th ed. 2000)). This Court "is troubled by the ALJ's failure to assess any of this evidence, which strongly indicates that Plaintiff has 'an inability to cope with the challenges of ordinary everyday life.'" Carrube v. Astrue, No. 3:08-CV-0830 (FJS)(VEB), 2009 WL 6527504, at *5 (N.D.N.Y. Dec. 2, 2009) (quoting Novy, 497 F.3d at 710 (defining deficits in adaptive functioning) (citing DSM-IV 42); also citing West v. Commissioner of Soc. Sec. Admin., 240 Fed. Appx. 692, 698 (6th

Cir. 2007) (unpublished opn.) ("Adaptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills.").

The Court concludes that the circumstances presented here call for the case to be remanded for calculation of benefits. See Carroll v. Secretary of Health & Human Servs., 705 F.2d 638, 644 (2d Cir. 1983)(reversal without remand for additional evidence particularly appropriate where payment of benefits already delayed for four years; remand would likely result in further lengthening the "painfully slow process" of determining disability).

## IV. Orders

For the reasons set forth above, Defendant's Motion for Judgment on the Pleadings (Docket No. 9) is **denied.** Plaintiff's request in his Complaint (Docket No. 1) for reversal of the Commissioner's decision and remand for calculation of benefits is **granted.** Accordingly, the Commissioner's decision is reversed and the matter is remanded to the Commissioner solely for calculation and payment of benefits to Plaintiff.

**ALL OF THE ABOVE IS SO ORDERED.**

S/Michael A. Telesca

_____
    MICHAEL A. TELESCA
United States District Judge

DATED:     October 6, 2011
           Rochester, New York